Case number 251309, United States of America, ex rel. Ronaldo Solano et al. v. Barton Associates, Inc. At this time, would counsel for the appellants please introduce themselves on the record to begin? Yes, may it please the court, Christopher Furlong for the appellants. This case arises from a scheme in which Barton, the epilee, supplied physicians to rubber stamp prescriptions for medically unnecessary services so that downstream providers could bill Medicare. The complaint alleges detailed facts about that scheme to defraud the government health plans paired with facts supporting a strong inference of actual claim submission. The first question on appeal is whether the district court misapplied this court's settled Rule 9b standard by dismissing an FCA inducement complaint for lacking details about specific false claims and for supposedly lacking reliable indicia of claim submission. The complaint satisfies the governing standard, but the district court acquired more and dismissed on that basis. The second issue on appeal concerns the district court's decision to dismiss the original complaint with prejudice. This is the first dismissal of the original complaint, the first time it was subject to adversarial scrutiny and judicial review. Appellants sought leave to amend at the hearing and again in a timely Rule 59e motion. The district court nevertheless dismissed with prejudice without any analysis or finding of futility or any other Rule 15 factor. That was an abuse of discretion and this court can resolve that appeal on this basis alone. Let me turn to the Rule 9b issue. The district court explained its dismissal in the following terms. It stated that beyond a description of the fraudulent scheme, quote, the complaint is minimal as to any details about specific false claims and it lacks reliable indicia that lead to a strong inference that claims were actually submitted. Now that sentence actually reflects two distinct errors. First, the district court applied the wrong standard. By faulting the complaint for lacking details about specific claims, the court imposed a requirement of claim by claim pleading that this court has repeatedly rejected in FCA inducement cases. Now second, although the district court did cite Duxbury and its progeny for the correct Rule 9b standard, it misapplied that standard. The court concluded that the complaint lacked reliable indicia of claim submission because it mistakenly treated the list of illustrative indicia from Duxbury as a required checklist of pleading elements. That approach substitutes a mechanical item counting exercise for the proper contextual and functional inquiry into whether or not the pleaded facts taken together support a strong inference that claims were actually submitted. Now to understand why that approach is wrong, it helps to recall what Duxbury itself involved. Now in Duxbury, the relator alleged a kickback scheme in which a drug manufacturer paid third-party physicians to prescribe a particular medication. Now because the relator had no access to the physician's billing records, he could not identify specific claims submitted to the government. But what he could do was allege specific facts about how the scheme operated, which physicians participated, the categories of patients affected, and all that was taken to support a strong inference that claims are submitted to government programs. In that context, the court articulated what is now a settled Rule 9b standard for third-party inducement cases under which a relator need not plead claim-by-claim details if the complaint pleads sufficient facts about the scheme to support a strong inference that resulted in the actual submission of false claims. The court recognized that in inducement cases, relators often stand outside the billing process. If Rule 9b required claim-by-claim pleading at the... What do you have here that satisfies the Duxbury standard? Well, your Honor, there's a description of the scheme. It was around the spring of 2019, a sales associate from Barton, from the Epple East, called one of the relators, Mr. Solano, and pitched him on the scheme. What he described was a scheme where the third-party providers would identify Medicare-eligible patients and Medicare-covered services, and then the third-party providers, who were not licensed physicians, would generate these prescriptions. Barton would then supply a rubber stamp from a physician so that then those third-party providers could bill Medicare. Barton, the sales associate, he wasn't just pitching him on an idea. It wasn't just a suggestion that this would be a cool thing to do. He actually represented this as an operational scheme where there was a lot of uptake already. There were already other third-party providers participating, using Barton's rubber-stamped prescriptions to obtain reimbursement from Medicare. Now, you might say, and Barton's Epple East suggests in their brief, that perhaps this was just a salesman talking. Maybe it's just sales puffery. There was no real scheme off the ground. It was just somebody's idea. In fact, our second relator saw this scheme in operation from the other side of the transaction. He was employed by one of these third-party providers who he witnessed, and this is alleged in the complaint, he saw them use those prescriptions, those rubber-stamped prescriptions, to then submit claims to Medicare. And so these facts taken together, even though relators are not able to identify specific reimbursement claims, all that taken together supports a strong inference that claims were actually submitted as a result of this scheme. Can I ask you, counsel, where exactly? I'm just looking at your complaint, and there's just, I think, about five pages that talk about the alleged misconduct. So you were just talking about the phone call from somebody at Barton, Mr. Stockhouse, to Mr. Solano. In the allegations there, paragraphs 51 through 58, where is there an allegation that the Barton physicians are just going to never meet with the patient, do everything, you know, essentially rubber-stamp, as you've said? I think the clearest statement of that is paragraph 56, where we say the Barton sales associate told Mr. Solano that while the physicians must be able to review the request and be allowed to reject, in fact, 99.9 percent of the submitted requests are approved. But why does that show that there's, you know, a strong inference of fraud? Again, there's nothing there about they're not examining the patients. These are supposedly patients that are in need of these services. So why is that enough to suggest that what's happening is a fraud? Your Honor, I could spend some time trying to find the exact paragraph where it is alleged that the Barton physicians did not personally meet the patients. I'm confident it is in there. I'm not sure it's the best use of my time right now. That's from the first relator. Correct. Yes. So the question is, aside from that first person who's selling the scheme, what backs it up in the … Well, so the second relator worked for one of these third-party providers. But the second relator doesn't say that there was no actual treatment being done. Your Honor, respectfully, the allegation is not that the services weren't actually rendered. The allegation is that the services or the equipment provided But he doesn't say that it wasn't medically needed. That's right. He just says everything was approved. I'm sorry? He just says everything was approved, virtually everything was approved. Correct. So how do we deduce that it's, you know, under Duxbury, it's got to be a pretty high likelihood that claims, the false claims were actually made. So you've got the first person saying here's a scheme. You agree that's not enough. Do you? Or do you not? Do you think the first person, the relator saying here's a scheme, that's enough for you to … Well, the first person, Mr. Solano, doesn't just say here's the scheme. He was told by the Barton Sales Associate that the scheme is already in operation. And that's enough? Would that alone be enough under Duxbury? I believe so. I mean, this Court has to credit the allegations in this, you know, taking them as true in determining whether or not there's a sufficient basis to conclude that the claims were submitted. And the allegation is that, and the allegation based on the representations of this Barton Associate, the salesperson, that in fact these claims, the scheme was actually leading to actual claim submissions. Because there were third-party providers that were participating in the scheme already. This was not something that was being proposed off the bat. Did he give dates or times or anything, rough time periods about when that was occurring? Well, rough time periods would have been 2019. That's when the initial phone call to Mr. Maxon was in 2019. And Mr. Maxon worked for MedTech throughout 2019. So that would have been a rough period. I know Duxbury also specifically, you know, if we are going to look at Duxbury as a... Did you argue to the District Court that that alone would have been enough? To be honest, I don't recall if we addressed that issue in that particular way, whether we said that that by itself was sufficient. I think what we said was that the allegations taken together are certainly enough to establish a strong inference of claim submission. If that's not enough, I'm not following exactly how this second set of allegations pushes it over the line, given what is alleged to have been said. The second set of allegations from the second relator add the fact that, well, it adds to what Mr. Solano already knew from representations by the sales associate. The sales associate said, here's a scheme we'd like you to participate in. The scheme is already in operation. We have other providers already using our rubber stamps. What I'm saying is there's nothing about the second set of allegations that would justify calling it a scheme, as opposed to there was just approval of requests for reimbursement, right? Nothing, just as Judge Ruckelman said, there's nothing in that set of allegations that suggests there was any fraudulent conduct occurring. It's only the earlier person who's the basis for that. I think it's fair to say that the second relator by himself does not establish, may not be enough to establish a scheme, but his corroborations add to what the first relator alleges, which is that the scheme was in operation, and the second relator saw it in operation from his side. It may be that his allegations on their own aren't sufficient, but taken together, they add to what the first relator alleges. Now, FLEs rely pretty heavily in their brief on the Hagerty case to suggest that dismissal was proper here, but in fact, that case I think is helpful to illustrate why dismissal was improper here. Now, in Hagerty, the relator alleged that the defendant encouraged providers to perform unnecessary services using its device, excuse me, to perform unnecessary surgeries using its device. Now, the complaint described that urging in detail, but it alleged no facts showing that the providers accepted that inducement, that they performed unnecessary procedures or that they submitted claims. The allegations were, as this Court explained, untethered from utilization or payment. That absence is why Hagerty failed under the Duxbury standard. The allegations described the urging to participate, but not the uptake, and it provided no factual bridge to actual utilization or reimbursement, but here the case is quite different. Here the complaint does not merely allege that Barton urged others to engage in a scheme. It alleges facts showing that the inducement was actually accepted and acted upon. Barton itself, the sales associate itself, described a scheme already generating Medicare revenue, and relators allege it functioning in practice with identified downstream providers. That difference in uptake versus mere urging is precisely why Hagerty doesn't control and why Duxbury does and why the complaint in this instance should not have been dismissed. We're taking to the second issue in our appeal concerning the amendment, and it provides, as I said earlier, a narrow basis for disposition. This is the first dismissal of an original complaint, the first time it was subjected to the adversary's scrutiny and judicial review. Relators requested leave to amend at the oral hearing and renewed their request in a timely Rule 59e motion. The district court nevertheless dismissed with prejudice without finding futility or any other Rule 15 factor. Under Foman v. Davis, that is an abuse of discretion. Now Barton complains that relators did not file a Rule 15 motion, a formal Rule 15 motion, or seek amendment before dismissal, but this court has never held that amendment is forfeited absent a standalone pre-judgment Rule 15 motion. Plaintiffs are not required to preemptively amend a motion while, excuse me, they're not required to preemptively amend the complaint while a motion to dismiss is pending. And a request to amend need not be styled as a standalone Rule 15 motion. Once the amendment is requested, with prejudice dismissal requires a stated Rule 15 justification. And Barton cites the case Gray v. Evercore for the proposition that a request to amend embedded in an opposition can simply be ignored. Now that's an over-reading of Gray. Gray involved a complaint that failed as a matter of law, where amendment was futile on its face because the underlying legal theory was defective. In that posture, futility was apparent from the complaint, placing the case squarely within one of Foman's exceptions. This case is different. Here the district court did not reject relators' theory as legally invalid. It identified at most a pleading deficiency under Rule 9b, and where the issue is pleading sufficiency rather than legal impossibility. And futility cannot be apparent from the face of the complaint, and dismissal with prejudice without a Rule 15 analysis or finding of any Rule 15 factor is an abuse of discretion. Barton's reliance on the ACA financial case is an apposite here. That case involved a plaintiff who never sought to amend at the district court at all. The issue of amendment came up only on appeal. But here relators request an amendment at the hearing, again on a Rule 1590 motion. ACA financial expressly turns on the absence of any such requests and therefore does not apply. Before you sit down, on page 14 of your brief, you cite Gonzalez v. Banco Central Corporation with a parenthetical that doesn't appear in that case, and that was pointed out by your opponents, and you haven't responded to it to the court at any point, including in your argument today. Do you want to address that? Yes, Your Honor. That was an error. That is a regrettable error. How did it come about? I'm sorry? How did it come about? I'm not sure exactly how it came about. The first thing we did when it was brought to our attention was to make sure that our arguments still stood, even if we were to excise those errors, and we believe that our arguments do stand. How the errors got introduced, I would be speculating on my own workflow, my own work patterns, but it would be speculation. If Your Honor would like, I can speculate, but I don't know for sure how it happened. And then there's other portions of the brief that seem to have similar quotations of non-existent things, including portions of quote from the district court, things the district court doesn't appear to have said. And that also wasn't addressed, notwithstanding brought to the attention of you, in any notice to the court or any statement of a corrected brief, nor did you choose to address it before us, despite having this entire time for oral argument. Your Honor, as I said, the errors are regrettable. We did not address them in the reply because we thought the most important thing to do in reply was to certainly not rely on those errors and reproduce them, but to didn't think to tell the court that they were mistakes. Counsel, did you read the cases that you cited in your brief? Yes, Your Honor, I did. You read all of these cases?  And you didn't notice that the citations that you claimed were in the cases weren't there? Again, when it was called to our attention and we double-checked, I certainly noticed. If I may speculate, concerning my own work process, I read the cases, I take notes, I suspect what happened is that I relied on the notes when I was writing the brief. There were some quotes in the notes that were mistaken, ended up in the brief. Of course, I should have double-checked that. I regret the error. It does not affect the strength of our underlying arguments. We may follow up with an order from the court asking you to respond further, but thank you. Thank you, counsel. At this time, would counsel for the appellee please introduce themselves on the record to begin? Good morning, Your Honors. Jordan Bach from Goodwin-Proctor on behalf of Barton. Relators have not satisfied Rule 9b. Much like the allegations this court deemed insufficient in Kelly and Lawton, which relators notably reversed the holdings of in their reply brief, the allegations failed to provide the necessary who, what, where, when, and how required under this court's case law. The general scheme allegations that relators focus heavily on in their argument have no details regarding any false claims, which is the key to clearing Rule 9b in a False Claims Act case. With respect to co-defendants Medtech and Accenture, there are only three paragraphs that involve the Barton Staffing Agency specifically, and those three paragraphs likewise provide no details of the submission of false claims or reliable indicia to plead that false claims were actually submitted. Relators' procedural arguments also fail. It was not an abuse of discretion for the district court to decline to effectively sua sponte grant relators leave to amend when relators never provided the district court with any indication of how they would cure the identified deficiencies in their allegations. Nor did the district court err by denying Barton's motion for reconsideration. This court has expressly held, including in the FCA context, that there is no per se rule that a district court must provide an explanation for denial of a motion for reconsideration. And while relators waived any argument on the merits of their motion for reconsideration, their arguments would fail thereto. The amended complaint that relators attached to their motion for reconsideration makes clear that relators cannot remedy any of the deficiencies in their initial complaint. Finally, despite being put on notice in Barton's response brief, relators' reply brief has a series of additional made-up quotations and directly reverses the holding of several decisions that are repeatedly cited throughout the reply brief. Because the district court correctly denied the motion to dismiss and the motion for reconsideration, we respectfully request that this court affirm the decision below. Unless the court has a particular place it would like to begin, I'll start with the core Rule 9b issue. We don't think these allegations come anywhere near even the allegations in cases like Kelly and Lawton, which this court held, contrary to what relators said in the reply brief, that the allegations there were not sufficient. Can I ask you one question about that as I was reading the complaint? Do we even know from the complaint that any of the patients were, in fact, Medicare patients versus Medicare-eligible patients? No, I don't believe so. And the district court pointed that out. There are a number of references to Medicare-eligible patients, but as the district court said, I believe, on A-74 and 75, there's no actual allegation that these patients were enrolled in Medicare specifically. I think even beyond that, the complaint specifically says it's using Medicare as a catchphrase for all government health programs, which would be Medicare, Medicaid, TRICARE, all of the major programs. And what this court has recognized in the FCA context is you need to have, among other allegations, at least some indicia that false claims are going to a government program, which means you need to, among other elements, identify the government health program. And the complaint, I think, A, has the problem that you identify Judge Rickleman, and then B, doesn't actually even identify a specific program they're eligible for. Can I just understand whether you're talking when you're making these points about the allegations by the first relator or the allegations by the second relator? And the reason I ask that is I'm just trying to think how Duxbury operationally works. When someone walks in and says, hey, I'm with the bad guys. We have this terrible scheme. Let me show you how it works. I'd love you to participate. It's been going on for a year. That's the scheme. And you could say that's a pretty good indication that something bad's happening. And that's what we're challenging. Then they come in with a second person who says, you know, that entity he's talking about, it exists. It actually operates. So it's not like a hot dog stand. It is actually a person that files claims for Medicare reimbursements, et cetera. So now I've got those two things together. I totally understand why the second thing isn't nearly enough. But I guess I'm just under Duxbury. What exactly is it that makes the first relator not sufficient? What I think Duxbury requires is at the end of the day, even under the more flexible standard, you need to have details of the submission of false claims. And what relators refer to repeatedly is this, quote unquote, more flexible standard. And the idea that you don't need to plead specific false claims, that's correct. That's what the district court applied. That's clearly what Duxbury holds. But I think what Duxbury stands for is you need sufficient allegations to get to the same spot at the end of the day. I think what the flexible standard means is not that we're lowering rules. I get that. But so I'm just going to go back to my hypothetical. The bad guy comes in from the bad guys and says, here's how we do it. It's been going on for a year. We'd love you to participate. Is there some reason under Duxbury that that's not enough? Yes. So what is it exactly that's missing from that under Duxbury? So what Duxbury said, and the court said there that that was a close call, and has later said those allegations were, quote, barely adequate. The allegations in Duxbury were, for example, Western Washington Hospital has received $5,000 of free Procrit, the drug at issue there. They then submitted that free Procrit for reimbursement to Medicare. So they were effectively pocketing it because they were receiving the free drugs. And what the court said was that showed, had the sufficient details. It's not a checklist, but you need some number of the who, what, where, when, and how to show that there was the actual submission of false claims. Most of this court's False Claims Act cases have, I think, far more detailed allegations than we have here of a sort of bad guy scheme. So if you think about Kelly, there were allegations there that the doctors were receiving sort of free dinners and vacations to push the off-label prescription of Zolaire. And the court said, that's not sufficient. You still need allegations that get you over the line. But here, I guess, just to play it through, doesn't the first relator say, this group is without any basis approving claims that are then being submitted for Medicare. And they've been doing it for roughly a year, something like 2019. He said, they've been doing it, and we'd like you to join in on that. Isn't that what he says? So I'm just trying to think, what's, what in your view on the checklist of who, what, when, where is missing? We've got a who, we've got a when, we've got a where. Do you see what I'm saying? So what exactly is missing from that? So I think they probably have the who, because they're describing these particular entities. I think, I think you're missing the where. It doesn't say in particular where this is happening, and there's no indication of whether it's happening where these companies are headquartered or anything like that. I think the when, that one's maybe a closer call. I don't think they really cut it. And would you, and Duxbury's a good comparison. Duxbury had, if you look at the complaint in Duxbury, it's not directly clear from the opinion itself. A multi-year scheme, and they, the allegations are pinpointed. Okay, Western Washington submitted it in this year. You know, Seattle Hospital submitted it in this different year. So it was, had some specificity beyond just, well, we received the phone call in this date range. Wasn't the first, isn't the relator here allegedly saying they just are, that's all they do? They're just constantly doing it? So during that time frame, that, if that's true, we take it as true, then obviously false claims are being submitted during that time frame. Well, I think the sort of the obviously false claims are being submitted really runs counter to this court's precedence on the false claims. But he, he, he alleged they were during that time frame. Is that wrong? If I may just piggyback, that's why I was trying to ask about the key paragraphs about the first relator who is Solano. Solano is the first relator, right? That's correct. And you know this complaint better than I do, but I just didn't see any of those allegations actually in the conversation with Mr. Stockhouse. I mean, again, it talks about Medicare-eligible patients. There's nothing about we're submitting false claims. There's just the allegation, which your opposing counsel pointed out, that, you know, most of the claims are approved, but we don't know that they're not meeting with the patients. I mean, none of that is in these paragraphs. Am I wrong about that? No, I think that's correct. I mean, when you asked relators, what they pointed to was paragraph 56, which paragraph 56 specifically says that the Barton physicians must review the request and be allowed to reject it. I don't think anything about having a physician who must be allowed to review and reject a request suggests any sort of fraudulent scheme. I'll also point out that, you know, the relators repeatedly collapse Barton, which is a staffing agency, and the Barton physicians, who are independent contractors, and that happens throughout the complaints. I also think it's important to distinguish the two entities. But looking at the other – But just to be clear, in these eight paragraphs, there's nothing about – This is the first relator? This is the first relator, Solano. There's nothing about our physicians never meet virtually or otherwise with the patients. There's nothing about these are actual Medicare patients. There's nothing about we fraudulently approved these various treatments, genetic cancer screening, DMEs, pain creams, et cetera. All we have is that Barton encourages people to create call centers where eligible patients who need these services may be able to get prescriptions for them. Have I missed something? No, that's certainly how I read the complaint, and maybe that would have been a more direct way to answer. Definitely would have been. No, that's very fair. I think if you look at paragraph 54, in particular, what it says is, you know, even if you – I think these are at too high a level, really, to make out an FCA claim, but even if we just take these allegations, what paragraph 54 says is, you know, Barton is encouraging the recruited entity to establish a call center to solicit eligible patients for this wide range of services. You know, they're then – one of the matters is assigned to their prescription – to a physician. The physician reviews the request, must be allowed to reject it, and then, you know, it has this allegation about a particular sort of arrangement for Barton then having the physician assigned. But, you know, as I think Judge Rickleman is pointing out, there's nothing in those allegations, even if you were to think that these are sufficient level of specificity to clear Rule 9b, that actually alleges a fraudulent scheme taking place. But what it says is that 99.9 percent of the submitted requests are approved in paragraph 56. That's what opposing counsel pointed to. That's right. But I don't think – I mean, A, I don't think there's anything about the fact that most of these requests are being approved that suggests it's fraudulent, particularly on Rule 9b. And then, B, you know, this – we're talking about a marketing call in particular, and I think all of the False Claims Act cases, you know, drill down much more carefully on – So as you read the complaint, no one – no relator came forward alleging a fraudulent scheme. Why do you hesitate? No. I was thinking about whether to answer your question first by saying – I think I'm always tempted to pivot toward the specificity issue, because that's what all the 9b cases focus on. But I think maybe the more fundamental way to answer that is to say, no, I don't think so. And I think that's really what the district court was picking up on, on A74 and 75, was there was no allegation that these patients were actually enrolled in Medicare. There was no allegation that they were medically unnecessary treatments. And if you don't have sort of those core allegations, that you don't have people being prescribed treatments for – I see. Because if you did have those, then it's less clear to me there's a problem here. That's sort of a – I think that's why I was hesitating, is I think even if – I know, but we don't have to get to that. No, that's true. So I don't need to sort of fight back against that. No, I don't think that those allegations appear anywhere in the complaint, and I think that's really what the district court was focusing on. And, you know, the relators have really sort of described the district court as putting in place this claim-by-claim requirement that say that they, you know, follow Carvelis, not Duxbury, and required the relators to plead this claim-specific information. But I think that the district court was clearly applying Duxbury, and I think in applying Duxbury was saying, you know, the complaint, you know, this is from A75, doesn't allege that the patients were enrolled in Medicare, doesn't allege that Barton was receiving any particular assessment or kickback fee for approving the prescription, doesn't allege that the prescription was medically unnecessary. You're not even missing just the allegations to say, oh, we haven't cleared Rule 9b, you're just sort of missing the allegations to make on a fraudulent claim in particular. Counsel, on the amendment point, since you've been reviewing the case law recently, don't we have quite a number of cases saying that we strongly discourage motions to amend after the whole motion to dismiss process has gone through, that the whole point is, if your proposing counsel has pointed out vulnerabilities and your complaint is drafted, you should just go ahead and move to amend and obviously attach your proposed complaint that you think would solve the deficiencies that have been identified. But waiting until you lose the motion to dismiss to make a motion to amend is strongly disfavored under our case law, correct? That's correct. And I point to ACA Financial in particular. I mean, I know the relators say, we rely on ACA Financial, but they cited in the opening brief, but the party there basically made a version of relator's argument, which was, well, we should have waited. We didn't know exactly how we were going to need to amend. And ACA Financial said, that gets it quote, exactly backwards, that you are on, you have a motion to dismiss. There were multiple points in this case when the relators could have amended. They could have filed a formal motion. They could have explained in the opposition to the motion to dismiss how they would have amended. They could have even, I think this would not have been sufficient, but explained in more detail at the hearing what allegations they would add. I think it wasn't even, it wasn't only the format that's arosen, it was the particular content, which was a boilerplate request. And this court has said over and over again that, you know, you need to present the specific reasons for the amendment. And while we were not arguing that the motion to amend was specifically foreclosed in the post-judgment context, there is a higher standard that applies. That's from ACA Financial, which is discussing James in particular, both because you're filing a Rule 59e motion, you have to satisfy the Rule 59e requirements, point one. And point two is exactly what I think Your Honor was pointing out, which is there are finality concerns here. You've gone through the whole process. You missed several opportunities to amend. You can't then get another bite at the apple after the case has been dismissed and we've really moved on to other elements. And I'll finally, you know, my final second, say just briefly that on Rule 59e and reconsideration, this court has said in Kelly and in Gee in particular, that simply denying the motion for reconsideration without a justification is not a per se problem. And the quotes that back that argument up in the opening brief do not appear in a decision that we've been able to find. Thank you. And as I said, we may follow up on the citations issue. Thank you.